STATE of Wisconsin, Plaintiff-Respondent,

v.

Keith S. KRAUSE, Defendant-Appellant.†

Court of Appeals

*Nos. 91–1329-CR, 91–1331-CR, 91–1332-CR. Submitted on briefs January 24, 1992.—Decided April 1, 1992.*

(Also reported in 484 N.W.2d 347.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Keith A. Findley,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Phillip A. Koss,* district attorney, and *Jayne Davis Dewire,* assistant district attorney. On behalf of the plaintiff-respondent, there was a supplemental brief by *James E. Doyle,* attorney general, and *James M. Freimuth,* assistant attorney general.

Before Brown, Anderson and Snyder, JJ.

SNYDER, J. In this consolidated appeal, Keith Krause appeals from judgments of conviction for operating a motor vehicle after revocation (OAR), third offense; operating under the influence of an intoxicant (OWI), fourth offense; and disorderly conduct, contrary to secs. 343.44(1), 346.63(1), and 947.01, Stats.[1] The trial court denied Krause's motion to suppress the results of a blood test for blood alcohol content (BAC) and Krause was found guilty.

The issue on appeal is whether the forcible extraction of a blood sample was a reasonable search by Fourth Amendment standards once Krause refused the test under the implied consent law. We conclude it was and affirm.

Most of the relevant facts, adduced at the suppression hearing, are undisputed. In the early morning hours of May 23, 1990, Officer Todd Dornfeld of the Walworth County Sheriff's Department was run off the road by a vehicle traveling north in the southbound lane of the

---

[1]Although Krause has appealed his conviction for operating without a license, no argument in his brief attacked that conviction. The admissibility of his blood test has no bearing on that charge. Therefore, we limit our statement of facts to the operating while intoxicated and disorderly conduct convictions.

highway. Officer Dornfeld pursued the vehicle and stopped it. Officer Dornfeld observed that Krause, the driver, smelled strongly of intoxicants and had bloodshot eyes and thick, slurred speech. Krause refused to take a field sobriety test.

Officer Dornfeld arrested Krause for OAR and OWI, placed him in the back of the police car, and began to transport him to the sheriff's department where a breathalyzer test would be done. En route, Krause became unruly and began spitting at the officer through the wire "cage" behind the front seat and kicking at the doors and windows. The officer stopped the car twice to try to put a seat belt on Krause but was unsuccessful, despite the aid of a back-up officer. After a third attempt, the officers "hog-tied" Krause and put him on the rear floor of the car. The trial court found, consistent with Krause's testimony, that the officer put a burlap bag over Krause's head because Krause continued to spit at him.

Officer Dornfeld then decided to take Krause to the hospital instead of the station because he believed a blood test would yield a more accurate measurement of Krause's BAC than would a breath test. The officer's decision also was based on (1) his belief that Krause's BAC was likely above 0.20% and the jail had a policy requiring arrestees with BACs over 0.20% to receive medical clearance before being jailed; and (2) his learning that Krause had at least three prior OWI convictions and there was a memo from the district attorney's office instructing officers making an arrest for a third or subsequent alcohol offense to obtain a blood sample from the arrestee. Officer Dornfeld did not seek a warrant because he believed it would take several hours to get a warrant

which would render the blood test meaningless.[2]

When Krause learned that a blood test was to be drawn, he became even more upset, stating that he "d[id]n't believe in needles" and that he did not want to get AIDS. At the hospital, Officer Dornfeld read Krause the "Informing the Accused" form. Krause adamantly refused to submit to a blood test, shouted vulgarities, and continued to spit and be unruly. Officer Dornfeld and at least two other officers placed a pillowcase over Krause's head, tied his feet down and held his arms while a medical technician drew blood from Krause. Krause struggled throughout the procedure. He testified: "I was fighting, moving my arm back and forth so she [the technician] couldn't do it [draw the blood]." His struggling and the officers' attempts to restrain him caused the needle to injure his arm. Krause also testified that an officer twisted his head so he could not see what was going on, causing him to break a tooth and bite his lip or tongue. He continued to spit and at that point was spitting blood at the officers and medical personnel. After the blood was drawn, Krause was taken to the jail where he submitted to a breathalyzer test. Ultimately, the blood test showed a BAC of 0.26%.

Krause moved to suppress the blood test results on the grounds that the blood sample was unreasonably seized. The state conceded at the suppression hearing that the blood sample was taken in violation of the implied consent statute, sec. 343.305, Stats., which does not authorize forcible withdrawal of blood, but argued that the forcible withdrawal was nonetheless reasonable and therefore admissible. The trial court found the withdrawal reasonable and denied the motion to suppress.

---

[2]A blood sample taken for purposes of measuring the BAC of a person arrested for OWI may be inadmissible if taken over three hours after the arrest. Section 885.235(3), Stats.

Krause was found guilty and sentenced as a repeat habitual traffic offender because on the date of the offenses he was under revocation as a habitual traffic offender. *See* sec. 351.08, Stats. He appeals.

The threshold issue is whether a blood test not taken in compliance with the implied consent law nonetheless is admissible. The Wisconsin Supreme Court has acknowledged that it is if the taking of the sample meets Fourth Amendment reasonableness standards. *State v. Zielke,* 137 Wis. 2d 39, 54, 403 N.W.2d 427, 433 (1987).[3] What is reasonable depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself. *State v. Guzman,* 161 Wis. 2d 80, 88, 467 N.W.2d 564, 566 (Ct. App. 1991), *aff'd,* 166 Wis. 2d 577, 480 N.W.2d 446, *petition for cert. filed,* No. 91-8133 (May 4, 1992). The reasonableness of a questioned action is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *Id.* When the material facts are undisputed, whether a search is permissible under the Fourth Amendment is a

[3]We also note that in sec. 7, ch. 193, Laws of 1977, the legislature repealed and recreated the implied consent law, eliminating the language in sec. 343.305(2)(b), Stats. (1975-76), which stated, "If the person refuses the request of a traffic officer to submit to a chemical test, no test shall be given . . .." By this statutory change, the legislature removed from Wisconsin drivers absolute control of whether a chemical test will be administered. Whether or not such evidence can be obtained should not depend on the arrestee's cooperation with law enforcement officers. To adopt that reasoning would result in a "premium given to the more obstreperous drunk driver who is more successful in forcibly resisting the withdrawal of a blood sample." *Carleton v. Superior Court,* 216 Cal. Rptr. 890, 896 (Cal. Ct. App. 1985).

question of law. *State v. Seibel,* 163 Wis. 2d 164, 171–72, 471 N.W.2d 226, 230, *cert. denied,* 112 S. Ct. 596 (1991). We determine questions of law *de novo. Id.* at 172, 471 N.W.2d at 230.

We need not engage in a balancing of the state's interest in obtaining evidence against Krause's interest in bodily privacy to determine whether requiring Krause to submit to a blood test was reasonable. The United States Supreme Court already has done that balancing in *Schmerber v. California,* 384 U.S. 757, 770–72 (1966). *See Seibel,* 163 Wis. 2d at 183 n.14, 471 N.W.2d at 235. It has determined that the drawing of a blood sample against a person's will is reasonable when (1) drawn incident to an arrest; (2) there is a "clear indication," rather than "the mere chance" that the desired evidence will be found in the blood sample; and (3) exigent circumstances exist. *See Schmerber,* 384 U.S. at 769–71.

Each of those elements is present here. There is no dispute that the blood was drawn incident to a lawful arrest. Furthermore, there was a "clear indication" that the desired evidence would be found. A "clear indication" means a "reasonable suspicion." *See Seibel,* 163 Wis. 2d at 173–74, 471 N.W.2d at 230–31. Thus, blood may be drawn in a search incident to an arrest if the police reasonably suspect that the defendant's blood contains evidence of a crime. *Id.* at 179, 471 N.W.2d at 233. Probable cause to suspect is not necessary. *Id.*

The record establishes that the police possessed a reasonable suspicion that Krause's blood contained evidence of the crime of OWI. The bases for this reasonable suspicion are Krause's driving on the wrong side of the highway, the strong odor of intoxicants and his slurred

speech, bloodshot eyes and unruly conduct. All are indicia of alcohol consumption. *Id.* at 181–82, 471 N.W.2d at 234. Taken together, these indicia give rise to a reasonable suspicion that Krause's driving was impaired by alcohol consumption. *Id.* at 183, 471 N.W.2d at 235.

Finally, exigent circumstances existed because alcohol rapidly dissipates as a result of natural bodily functions. *See Schmerber,* 384 U.S. at 770.

Krause asserts, however, that his refusal still is constitutionally protected because he told Officer Dornfeld that he "didn't believe in needles" and "d[id]n't want AIDS." This argument fails. These isolated comments do not establish that Krause is "one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing" whose wishes the *Schmerber* Court declined to address. *Id.* at 771. Moreover, Krause gave no indication that he preferred an alternate test, nor does he contend that the police refused a "reasonable request" for one. *Id.* at 760 n.4. On the contrary, Krause initially refused testing of any kind, including the field sobriety test. He was combative and unruly from the time he was arrested, apparently even before Officer Dornfeld determined to change his course and seek a blood test rather than a breath test. It thus is reasonable to assume that Krause's refusal and belligerence were born of his intoxication, rather than arising from a genuine fear or health concern. Consequently, the determination to draw the blood sample did not violate Krause's Fourth Amendment rights.

Having concluded that, however, we still must examine whether the manner in which the blood was taken was reasonable. *See id.* at 768. The question is not

limited to whether the force was necessary to accomplish a legitimate police objective. *Hammer v. Gross,* 932 F.2d 842, 846 (9th Cir.) *(en banc), cert. denied,* 112 S. Ct. 582 (1991). Instead, whether the force used was excessive is determined by an evaluation of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 845 (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)). We judge the reasonableness of a questioned action by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests, *Guzman,* 161 Wis. 2d at 88, 467 N.W.2d at 566, and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hammer,* 932 F.2d at 846 (quoting *Graham,* 490 U.S. at 396).

■■■■■

Proper application of the reasonableness test to the facts and circumstances of the particular case requires consideration of several factors. We must consider, for example, whether the test was administered by medical personnel in a proper setting according to accepted medical procedures. *See Schmerber,* 384 U.S. at 771. Other factors include the severity of the crime at issue; whether the suspect posed an immediate threat to the safety of the officers or others; and whether the defendant actively resisted. *Graham,* 490 U.S. at 396. Still other factors include whether the police refused the defendant's reasonable request for an alternate test and the degree of the authority's need for the sample. *Hammer,* 932 F.2d at 846. This determination presents a question of constitutional law which we review without deference to the decision of the trial court. *See Guzman,* 161 Wis. 2d at 88, 467 N.W.2d at 566.

The first factor to consider in assessing the reasonableness of the force employed is the "environment" of the test. Here, Krause's blood was drawn in a hospital by a medical technician using state hygiene laboratory materials according to accepted medical practices. "Vacuum" needles for quick extraction were used. Also, the usual second vial was not taken because Krause "would not remain still and did some damage to his arm." Overall, this procedure was reasonable.

The next factor to consider is the severity of the crime at issue. Our legislature has determined that combining the operation of a motor vehicle with being in an intoxicated state is *malum prohibitum* and is pervasively antisocial. *State v. Caibaiosai,* 122 Wis. 2d 587, 593, 363 N.W.2d 574, 577 (1985). Wisconsin also recognizes that drunk driving is a problem with significant social costs and, often, innocent victims. *See State v. Nordness,* 128 Wis. 2d 15, 33–34, 381 N.W.2d 300, 307 (1986). Therefore, the state has a substantial interest in apprehending, punishing and deterring drunk drivers. *See id.* The statute's escalating penalty scheme reflects a recognition that repeat drunk driving is even more intolerable. This factor weighs most heavily in the state's favor.

The next factor is whether Krause posed an immediate threat to the safety of the officers or others. The first show of force occurred in response to Krause's unruliness after his arrest. He was kicking and spitting, potentially interfering with Officer Dornfeld's driving. Restraining Krause in the back of the squad car thus was a reasonable means of assuring both Krause's and the officer's safety.

At the hospital, Krause posed a threat to his own safety as well as to those attending to him. By his own testimony, he was fighting and moving his arm back and forth so the technician could not draw the blood, and he bit his lip or tongue when, because of his continued struggling, other officers helped restrain him. Officer Dornfeld testified that the pillowcase was put on Krause's head because he continued to spit, his saliva striking an officer and the hospital personnel. The officer testified that he believed Krause's spitting of saliva and blood posed a physical danger because of AIDS. Thus, not only did Krause pose a threat of injury to himself—injury, in fact, realized—but the technician or an officer also might have been injured by the needle or a flailing limb. We conclude that force was employed against Krause to diminish the threat of injury he posed to himself and others.

The next factor is whether Krause was actively resisting. As we already have described, and as Krause readily admits, he was actively resisting by kicking, screaming and spitting. Furthermore, the officer stated that they removed the pillowcase at one point "to see if [Krause] threw up in it" and to offer Krause the chance to have the blood withdrawn without the pillowcase on his head, indicating that the force would have ceased if Krause's resisting had ceased. We agree with the trial court's conclusion that if the blood draw was unusual,

> [it] was because of the conduct of the defendant. He was spitting on the officer, violently engaged in combat, engaged the medical personnel in combat . . .. Anything that fell on his shoulders was directly attributable to his own combativeness.

591

The next factor is whether the police refused a reasonable request for an alternate test. This factor, too, weighs in the state's favor. Although Krause ultimately took a breathalyzer test, the record indicates that he initially refused all tests. There is no evidence that he asked for a breath or urine test in lieu of the blood test, nor does he assert that he made such a request.

Finally, we must assess the degree of the state's need for the sample. The fact that Krause exhibited numerous other indicia of intoxication does not negate the state's need for Krause's BAC. On the contrary, accurate, scientific evidence of BAC is needed to secure OWI convictions so that those who drive while intoxicated will be punished and others will be deterred from doing so. *See State v. Brooks,* 113 Wis. 2d 347, 355-56, 335 N.W.2d 354, 358 (1983).

Considering all of the factors, then, we conclude that the force used to restrain Krause while the blood sample was drawn was reasonable in light of the totality of the circumstances facing the officers at the time. Accordingly, we affirm the denial of the motion to suppress the evidence.

Krause also contends that his conviction for disorderly conduct should be reversed "[i]n light of the violation of [his] fourth amendment rights." Having found no constitutional violation, we need not address this argument.

*By the Court.*—Judgments affirmed.